Citation Nr: 1121865 
Decision Date: 06/06/11 Archive Date: 06/20/11

DOCKET NO. 07-13 194 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Huntington, West Virginia


THE ISSUES

1. Entitlement to an increased disability evaluation for the Veteran's left knee arthroscopic and partial medial meniscectomy residuals, currently evaluated as 10 percent disabling.

2. Entitlement to an initial disability evaluation in excess of 30 percent for the Veteran's post-traumatic stress disorder (PTSD) prior to January 18, 2011 and in excess of 50 percent thereafter. 

3. Entitlement to a total disability rating based on unemployability due to service-connected disability (TDIU). 

REPRESENTATION

Appellant represented by: Oklahoma Department of Veterans Affairs



ATTORNEY FOR THE BOARD

Nadine W. Benjamin, Counsel


INTRODUCTION

The Veteran (appellant) had active service from August 1988 to February 1992.

This matter came before the Board of Veterans' Appeals (Board) on appeal from a July 2006 rating decision of the Muskogee, Oklahoma, Regional Office which established service connection for posttraumatic stress disorder (PTSD); assigned a 30 percent evaluation for that disability, and denied an increased evaluation for the Veteran's left knee arthroscopic and partial medial meniscectomy residuals. In March 2011, the RO assigned a 50 percent evaluation for PTSD effective from January 18, 2011. 

In December 2008, and again in July 2009, the Board remanded the Veteran's claims to the RO for additional action. The case has been returned to the Board and is ready for further review. 

Because the Veteran is challenging the rating assigned for his service-connected disabilities and the record raises assertions that he is unemployable because of his service-connected disorders, the determination as to whether he is entitled to TDIU is part and parcel of the determination of the rating for the increased rating claims. Rice v. Shinseki, 22 Vet. App. 447, 453 (2009). It is noted that the RO denied a TDIU in July 2006. However the Veteran has continued to claim that he is unemployable due to service connected disorders in his appeal for higher ratings. While the Board has jurisdiction over this matter as to the issues decided below, the claim for TDIU is addressed in the Remand portion of the instant decision and REMANDED to the RO via the Appeals Management Center (AMC), in Washington, DC. VA will notify the Veteran if further action is required.


FINDINGS OF FACT

1. The Veteran's left knee disorder is manifested by limitation of motion, with complaints of pain and weakness; flexion is not limited to 30 degrees and extension has been documented as limited to 10 degrees in May 2006. 

2. For period prior to January 2011, the Veteran's PTSD has not been characterized by occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to compete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships. 

3. From January 2011, there is evidence of occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking or mood, due to service-connected PTSD, without a showing of total occupational or social impairment due to such symptoms as gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place, memory loss for names of close relatives, own occupation, or own name. 


CONCLUSIONS OF LAW

1. The criteria for an increased disability rating beyond 10 percent for left knee arthroscopic and partial medial meniscectomy residuals have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A (West 2002); 38 C.F.R. §§ 3.159, 3.321, Part 4, 4.3, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5003, 5260 (2010).

2. The criteria for a separate disability rating of 10 percent for limitation of extension of the left knee from May 2006 until February 2011 are met. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.10, 4.40, 4.45, 4.59, 4.71a, Diagnostic Code 5261 (2010). 

3. Prior to January 2011, the criteria for an initial disability rating in excess of 30 percent for PTSD have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2002); 38 C.F.R. §§ 4.3, 4.7, 4.130, DC 9411 (2010).

4. The criteria for the assignment of an initial evaluation of 70 percent, but no higher, for the service-connected PTSD from January 2011 have been met. 38 U.S.C.A. §§ 1155, 5103A, 5107 (West 2002); 38 C.F.R. §§ 4.7, 4.130 including Diagnostic Code 9411 (2010). 


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

VCAA

As provided for by the Veterans Claims Assistance Act of 2000 (VCAA), VA has a duty to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2002); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2010). 

Proper notice from VA must inform the claimant of any information and medical or lay evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. Quartuccio v. Principi, 16 Vet. App. 183 (2002). This notice must be provided prior to an initial unfavorable decision on a claim by the RO. Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006); Pelegrini v. Principi, 18 Vet. App. 112 (2004). 

VCAA notice errors are presumed prejudicial unless VA shows that the error did not affect the essential fairness of the adjudication. To overcome the burden of prejudicial error, VA must show (1) that any defect was cured by actual knowledge on the part of the claimant; (2) that a reasonable person could be expected to understand from the notice what was needed; or, (3) that a benefit could not have been awarded as a matter of law. See Sanders v. Nicholson, 487 F.3d 881 (Fed. Cir. 2007). 

In this case as to the issue concerning an increased rating, a letter satisfying the notice requirements under 38 C.F.R. § 3.159(b)(1) was sent to the Veteran in April 2006, prior to the initial RO decision that is the subject of this appeal. The letter informed him of what evidence was required to substantiate the claim and of his and VA's respective duties for obtaining evidence, and was issued prior to the initial rating decision in this claim. Additional letters were sent to the Veteran during the course of this appeal. 

As to the issue concerning the initial rating, this claim arises from his disagreement with the initial evaluation following the grant of service connection. Courts have held that once service connection is granted the claim is substantiated, additional notice is not required and any defect in the notice is not prejudicial. Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112 (2007). Therefore, no further notice is needed under VCAA. 

Next, VA has a duty to assist the Veteran in the development of the claim. This duty includes assisting him in the procurement of service treatment and pertinent treatment records and providing an examination when necessary. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159. 

The Board finds that all necessary development has been accomplished, and therefore appellate review may proceed without prejudice to the Veteran. See Bernard v. Brown, 4 Vet. App. 384 (1993). 

First, the RO has obtained VA outpatient records as well as the Veteran's service treatment records. The Veteran was also afforded VA examinations in connection with his claims. See 38 C.F.R. § 3.159(c)(4) (2010). To that end, when VA undertakes to provide a VA examination or obtain a VA opinion, it must ensure that the examination or opinion is adequate. Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). The Board finds that the VA examinations obtained in this case are more than adequate. The examinations provided adequate basis for rating the Veteran's disorders. 38 C.F.R. § 3.159(c) (4). Therefore, the available records and medical evidence have been obtained in order to make adequate determinations as to these claims. Further, there is no objective evidence indicating that there has been a material change in the severity of the appellant's service-connected disorders since he was last examined. See 38 C.F.R. § 3.327(a) (2010). Accordingly, the Board finds that VA's duty to assist with respect to obtaining a VA examination or opinion with respect to the issues on appeal has been met. See 38 C.F.R. § 3.159 (c)(4) (2010). 

Significantly, neither the Veteran nor his representative has identified, and the record does not otherwise indicate, any additional existing evidence that is necessary for a fair adjudication of the claims that has not been obtained. Hence, no further notice or assistance is required to fulfill VA's duty to assist in the development of the claims. Smith v. Gober, 14 Vet. App. 227 (2000), aff'd, 281 F.3d 1384 (Fed. Cir. 2002); Dela Cruz v. Principi, 15 Vet. App. 143 (2001); see also Quartuccio v. Principi, 16 Vet. App. 183 (2002).

Laws and Regulations

Disability evaluations are determined by application of the criteria set forth in the VA's Schedule for Rating Disabilities, which is based on average impairment in earning capacity. 38 U.S.C.A. § 1155; 38 C.F.R. Part 4. An evaluation of the level of disability present must also include consideration of the functional impairment of the Veteran's ability to engage in ordinary activities, including employment. 38 C.F.R. § 4.10. When a question arises as to which of two ratings apply under a particular diagnostic code, the higher evaluation is assigned if the disability more closely approximates the criteria for the higher rating. 38 C.F.R. § 4.7. After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the Veteran. 38 C.F.R. § 4.3.

The Veteran's entire history is to be considered when making disability evaluations. See generally 38 C.F.R. § 4.1; Schafrath v. Derwinski, 1 Vet. App. 589 (1995). Where entitlement to compensation already has been established and an increase in the disability rating is at issue, it is the present level of disability that is or primary concern. See Francisco v. Brown, 7 Vet. App. 55, 58 (1994). However, staged ratings are appropriate in an increased-rating claim in which distinct time periods with different ratable symptoms can be identified. Hart v. Mansfield, 21 Vet. App. 505 (2007). In cases where the original rating assigned is appealed, consideration must be given to whether the Veteran deserves a higher rating at any point during the pendency of the claim. Fenderson v. West, 12 Vet. App. 119 (1999). 

Pyramiding, the evaluation of the same disability, or the same manifestation of a disability, under different diagnostic codes, is to be avoided. 38 C.F.R. § 4.14. It is possible, however, for a Veteran to have separate and distinct manifestations attributable to the same injury, which would permit a rating under several diagnostic codes. The critical element permitting the assignment of multiple ratings under several diagnostic codes is that none of the symptomatology for any one of the conditions is duplicative or overlapping with the symptomatology of the other condition. Esteban v. Brown, 6 Vet. App. 259, 261-62 (1994). 

In addition, when evaluating musculoskeletal disabilities, VA must consider granting a higher rating in cases in which the claimant experiences additional functional loss due to pain, weakness, excess fatigability, or incoordination, to include with repeated use or during flare-ups. See 38 C.F.R. §§ 4.40, 4.45; DeLuca v. Brown, 8 Vet. App. 202, 204-7 (1995). The provisions of 38 C.F.R. § 4.40 and 38 C.F.R. § 4.45 are to be considered in conjunction with the diagnostic codes predicated on limitation of motion. See Johnson v. Brown, 9 Vet. App. 7 (1996). With any form of arthritis, painful motion is an important factor of disability. It is the intention to recognize actually painful, unstable, or malaligned joints, due to healed injury, as entitled to at least the minimum compensable rating for the joint. See 38 C.F.R. § 4.59.

The Board has reviewed all the evidence in the Veteran's claims file. Although the Board has an obligation to provide adequate reasons and bases supporting this decision, there is no requirement that the evidence submitted by the Veteran or obtained on his behalf be discussed in detail. Rather, the Board's analysis below will focus specifically on what evidence is needed to substantiate the claims and what the evidence in the claims file shows, or fails to show, with respect to the claims. See Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000) and Timberlake v. Gober, 14 Vet. App. 122, 128-30 (2000). 

The Veteran contends that his service-connected disabilities are more disabling than reflected in the current rating percentages assigned. In this regard, lay statements are considered to be competent evidence when describing symptoms or an event. However, symptoms must be viewed in conjunction with the objective medical evidence of record. Espiritu v. Derwinski, 2 Vet. App. 492 (1992). 


A Left Knee Disorder

The Veteran seeks an increased evaluation for his service-connected left knee disorder, currently evaluated as 10 percent disabling. 

The Veteran's left knee disorder, status post arthroscopy and meniscetomy, is rated as 10 percent disabling under DC 5260. Under that Code limitation of flexion of the leg warrants a 30 percent evaluation where flexion is limited to 15 percent; a 20 percent evaluation where flexion is limited to 30 degrees; a 10 percent evaluation where flexion is limited to 45 degrees; and a 0 percent evaluation where flexion is limited to 60 degrees. 38 C.F.R. § 4.71a, Diagnostic Code 5260 (2010). 

Limitation of extension of the leg warrants a 50 percent rating where extension is limited to 45 degrees; a 40 percent rating where extension is limited to 30 degrees; a 30 percent rating where extension is limited to 20 degrees; a 20 percent rating where extension is limited to 15 degrees; a 10 percent rating where extension is limited to 10 degrees; and a 0 percent rating where extension is limited to 5 degrees. 38 C.F.R. § 4.71a, Diagnostic Code 5261 (2010).

Arthritis due to trauma is rated as degenerative arthritis. 38 C.F.R. § 4.71a, Diagnostic Code 5010 (2010). Degenerative arthritis is rated based on limitation of motion under the appropriate diagnostic codes for the specific joint involved. 38 C.F.R. § 4.71a, Diagnostic Code 5003 (2010). However, when the limitation of motion of the specific joint or joints involved is noncompensable under the appropriate diagnostic codes, a rating of 10 percent is for application for each such major joint or group of minor joints affected by limitation of motion, to be combined, not added under Diagnostic Code 5003. Id. Limitation of motion must be objectively confirmed by findings such as swelling, muscle spasm, or satisfactory evidence of painful motion. Id. In the absence of limitation of motion, a 10 percent evaluation is assigned with x-ray evidence of involvement of two or more major joints; a 20 percent rating is assigned with x- ray evidence of involvement of two or more major joints with occasional incapacitating exacerbations. Id. Limitation of motion for the knee in this case may be rated under Diagnostic Codes 5256-5261. See 38 C.F.R. § 4.71a (2010).

Ankylosis of the knee is evaluated under Diagnostic Code 5256. 38 C.F.R. § 4.71a (2010). A 60 percent evaluation is assigned for extremely unfavorable ankylosis of the knee, in flexion at an angle of 45 degrees or more; a 50 percent evaluation is assigned for flexion between 20 and 45 degrees; a 40 percent evaluation is assigned for flexion between 10 and 20 degrees; and a 30 percent evaluation is assigned for a favorable angle in full extension, or in slight flexion between 0 and 10 degrees. Id.

Other impairment of the knee is assigned a 30 percent evaluation for severe recurrent subluxation or lateral instability; a 20 percent evaluation for moderate recurrent subluxation or lateral instability; and a 10 percent evaluation for slight recurrent subluxation or lateral instability. 38 C.F.R. § 4.71a, Diagnostic Code 5257 (2010). 

A 20 percent evaluation is assigned for dislocated semilunar cartilage with frequent episodes of locking, pain, and effusion into the joint. 38 C.F.R. § 4.71a, Diagnostic Code 5258 (2010). 

A 10 percent evaluation is assigned for removal of semilunar cartilage which is symptomatic. 38 C.F.R. § 4.71a, Diagnostic Code 5259 (2010). 

VA's Office of General Counsel has provided guidance concerning increased rating claims for knee disorders. Separate disability ratings may be assigned for distinct disabilities resulting from the same injury so long as the symptomatology for one condition was not "duplicative of or overlapping with the symptomatology" of the other condition. See Esteban v. Brown, 6 Vet. App. 259, 262 (1994). However, pyramiding, that is the evaluation of the same disability, or the same manifestation of a disability, under different diagnostic codes, is to be avoided when evaluating a Veteran's service-connected disability. 38 C.F.R. § 4.14 (2010). VA's General Counsel stated that compensating a claimant for separate functional impairment under Diagnostic Code 5257 and 5003 does not constitute pyramiding. See VAOPGCPREC 23-97 (July 1, 1997).

In VAOPGCPREC 9-98, VA's General Counsel reiterated that if a Veteran has a disability rating under Diagnostic Code 5257 for instability of the knee, and there is also X-ray evidence of arthritis, a separate rating for arthritis could also be based on painful motion under 38 C.F.R. § 4.59. In addition, the General Counsel considered a hypothetical situation in which a knee disability was evaluated under Diagnostic Code 5259 that was productive of pain, tenderness, friction, osteoarthritis established by x-rays, and a slight loss of motion. For the purposes of the hypothetical, it was assumed that Diagnostic Code 5259 did not involve limitation of motion. Given the findings of osteoarthritis, the General Counsel stated that the availability of a separate evaluation under Diagnostic Code 5003 in light of sections 4.40, 4.45, 4.59 must be considered. See Lichtenfels v. Derwinski, 1 Vet. App. 484, 488 (1991). Absent X-ray findings of arthritis, limitation of motion should be considered under Diagnostic Codes 5260 and 5261. The claimant's painful motion may add to the actual limitation of motion so as to warrant a rating under Diagnostic Codes 5260 or 5261.

The General Counsel further noted in VAOPGCPREC 9-98 that the removal of the semilunar cartilage may involve restriction of movement caused by tears and displacements of the menisci, but that the procedure may result in complications such as reflex sympathetic dystrophy, which can produce loss of motion. Therefore, limitation of motion is a relevant consideration under Diagnostic Code 5259, and the provisions of 4.40, 4.45, and 4.59 must be considered. 

In addition, the VA General Counsel has held that separate ratings may be assigned under Diagnostic Code 5260 and Diagnostic Code 5261 for disability of the same joint. VAOPGCPREC 9-2004 (September 17, 2004). Specifically, where a Veteran has both a limitation of flexion and a limitation of extension of the same leg, the limitations must be rated separately to adequately compensate for functional loss associated with injury to the leg.


The Evidence 

On a VA Fee Basis examination in July 2005, it was noted that the Veteran used a brace on his left knee to support it. On examination, locking pain and crepitus were noted on the left knee. It was stated that ankylosis was absent. Flexion was to 114 degrees with pain from 120 to 140 degrees and extension was to 0 degrees with no pain. Also the left knee motion was limited by pain, fatigue, weakness, and lack of endurance with no incoordination. Drawer and McMurray's tests were within normal limits. Status post arthroscopy and partial medial meniscectomy of the left knee, recent history and physical examination was the finding. X-rays were noted to reveal mild joint space narrowing, likely arthritic irregularity of the articular surface of the medial tibial plateau suggesting post-traumatic arthritis with follow-up MRI recommended on X-rays. 

In May 2006, the Veteran underwent a VA Fee Basis examination. He complained of pain and swelling with walking or standing. He reported difficulty using stairs, kneeling and stooping. Examination of the skin showed three small oval scars around the left patella are which were faded. The examiner stated that due to fading he could not measure the scars. All were level with the skin with no tenderness, disfigurement, or ulceration. There was no adherence, instability or inflammation as well as no edema, tissue loss, keloid formation, hypo or hyperpigmentation, or any abnormal texture. He had a slight left limp and reported that he used a brace for the left knee for stability. There was weakness and tenderness on the medial and lateral aspects. Crepitus was noted and there was no ankylosis. Motion of the left knee was as follows: flexion to 90 degrees with pain and extension to 10 degrees with pain. After repetitive use there was no additional limitation in the range of motion and not fatigue, lack of endurance or incoordination; however there was pain and weakness. The varus/valgus signs were negative and the McMurray's test is moderately positive in the left knee. X-rays showed moderate chronic osteoarthritic changes. 

The Veteran was examined by VA in February 2011. The claims file was reviewed and his history was documented. His symptoms were noted as giving way, instability, pain, and weakness. He was noted to always use a brace and he had a slow gait. On inspection it was reported that there was no swelling, edema or effusion. Flexion was to 40 degrees without pain and to 60 degrees with pain. Extension was to 0 degrees. Pain was noted on repetitive motion with no additional limitation of motion. There was no ankylosis. X-rays showed mild degenerative changes. The finding was, degenerative changes of the left knee. 

Discussion

The Veteran's left knee disorder has been rated under DC 5260. As noted above, Diagnostic Code 5260 provides ratings based on limitation of flexion of the leg, where flexion limited to 45 degrees is rated 10 percent disabling; flexion of the leg limited to 30 degrees is rated 20 percent disabling; and flexion of the leg limited to 15 degrees is rated 30 percent disabling. 38 C.F.R. § 4.71a, DC 5260. Normal range of motion of the knee is from zero degrees of extension to 140 degrees of flexion. 38 C.F.R. § 4.71, Plate II. 

After a careful review of the evidence above, the Board finds the Veteran's left knee is not more than 10 percent disabling. The evidence of record did not demonstrate limitation of flexion to 30 degrees or less, which would be required for a higher rating under DC 5260. 38 C.F.R. § 4.71a, DC 5260. When the Veteran was examined in July 2005, flexion was to 114 degrees with pain from 120 to 140 degrees. In May 2006, flexion was to 90 degrees and in February 2011, flexion was to 40 degrees without pain and to 60 degrees with pain. Thus a higher rating under DC 5260 is not supported by the record. However as to limitation of extension, the record shows a finding of extension limited to 10 degrees in May 2006. Thus a separate 10 percent rating for limitation of extension of the left knee is warranted from May 2006 to February 2011 since for limitation of extension, an evaluation of 10 percent under Diagnostic Code 5261 contemplates pain on motion and extension limited to 10 degrees or less. As noted above, on examination in February 2011, extension was documented as to 0 degrees. 

It is clear from the record that the Veteran has functional impairment. There is limited motion and painful motion. The provisions of 38 C.F.R. § 4.59 establish that the Veteran is entitled to a minimum compensable evaluation for painful motion. However, evaluations in excess of the minimum compensable rating must be based on demonstrated functional impairment. Here, the Veteran is already assigned a 10 percent rating for painful motion and limited flexion and has been assigned a 10 percent rating for limitation of extension for a period of time. Thus, the issue remaining is not whether there is pain on motion, or whether such pain would additionally limit the flexion or extension, but whether that additional limitation would decrease the flexion to 30 degrees, or extension to 15 degrees. Such additional limitation is simply not shown in the clinical evidence, and the Veteran has not asserted such limitation. The Board finds that there is no additional functional loss not contemplated in the 10 percent rating assigned and that an increased evaluation on this basis is not warranted. The Veteran reported pain, but painful motion is reflected in his 10 percent evaluation. Even considering all of the functional impact as service connected, the examiner did not describe such impairment of either flexion or extension that would warrant a higher rating for either. The Veteran's statements are credible, but even when accepted as true, do not provide a basis for a higher evaluation for either flexion or extension. 

The Board has also considered the applicability of other diagnostic codes. 
In this case, there is no clinical evidence or assertion on the part of the Veteran that there is nonunion or malunion of the tibia and fibula, absent or dislocated semilunar cartilage, or genu recurvatum. There is no ankylosis. As such, ratings under the corresponding codes are not warranted. Although the Veteran has complaints of instability, objective finding do not show that he has recurrent subluxation or lateral instability. It is noted that in July 2005 on examination, Drawer test was normal. In May 2006, the varus/valgus signs were negative. Thus there is no objective finding of instability and a separate rating for instability is not warranted. (DC 5257). 

The Board has also considered an increased evaluation for traumatic or degenerative arthritis. But a 20 percent evaluation is only warranted for X-ray evidence of involvement of 2 or more major joints or minor joint groups, with occasional incapacitating exacerbations. 38 C.F.R. § 4.71a, Diagnostic Code 5003, Note (1). There is no evidence of incapacitating exacerbations here. Accordingly, an increased evaluation is not warranted under alternative diagnostic codes. 

The Board has considered whether a separate rating is warranted for scars. However there is no showing that the Veteran's left knee scars are unstable, deep or painful (DC 7804-DC 7801) or cover an area of 144 square inches or greater (DC 7802). There is no showing that the scars in any way interfered with function (DC 7805).

In sum, the Veteran's service-connected left knee disorder is manifested by painful limitation of motion and such symptomatology warrants a 10 percent rating for painful motion on flexion and a separate 10 percent rating for limitation of extension to 10 degrees for the period documented. However, a rating higher than 10 percent for limited extension is not warranted, and a higher 20 percent rating for limited flexion is not warranted. 

After a review of all the evidence in this case, lay and medical, the Board finds that at no point during the rating period on appeal did the Veteran's left knee disability manifest with limitation of flexion or function that more nearly approximates the criteria for a higher disability rating of 20 percent. The evidence does show entitlement to a separate compensable rating of the left knee based on limitation of extension for the time period documented. 38 C.F.R. § 4.71a. 

Based on the analysis above, the Board finds that a preponderance of the evidence is against the claim for higher rating than 10 percent for a left knee disability for limitation of flexion and that a separate 10 percent rating is warranted for limitation of extension from May 2006 to February 2011. 


Increased Initial Evaluation for PTSD

The Veteran has been assigned a 30 percent evaluation for post-traumatic stress disorder (PTSD) prior to January 18, 2011 and a 50 percent evaluation from January 18, 2001. PTSD is rated under DC 9411. Under that Code, a 30 percent rating is assigned where there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, and mild memory loss (such as forgetting names, directions, recent events). 38 C.F.R. § 4.130, Diagnostic Code 9411.

A 50 percent rating is warranted for occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short-and long-term memory (e.g. retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing effective work and social relationships. Id.

A 70 percent rating is warranted for occupational and social impairment manifested by deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); inability to establish and maintain effective relationships. Id.

A 100 percent rating is assigned when there is total occupational or social impairment due to such symptoms as gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place, memory loss for names of close relatives, own occupation, or own name. Id.

The global assessment of functioning (GAF) score reflects the psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. See Carpenter v. Brown, 8 Vet. App. 240, 242 (1995); see also Richard v. Brown, 9 Vet. App. 266, 267 (1996). 

A GAF score of 41 to 50 is defined as serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifter) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). 

A GAF of 51 to 60 is defined as moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). 

A GAF of 61 to 70 is defined as mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships. See QUICK REFERENCE TO THE DIAGNOSTIC CRITERIA FROM DSM-IV, 46-7 (1994). 

The Evidence

VA outpatient treatment records show that in August 2005, the Veteran was seen for the first time. He complained of depression, lack of sleep, nightmares and control of anger. It was noted that he was casually dressed and had good grooming. He was alert, and oriented to person, place, time and situation. He had a depressed and anxious mood congruent to his affect. His speech was coherent and goal directed. His thoughts were organized. He denied suicidal or homicidal ideation. He denied auditory or visual hallucinations. The finding was major depressive disorder, rule out PTSD. 

In a February 2006 letter, a private examiner stated that he saw the Veteran in his office in January 2006 for a psychiatric examination. It was noted that the Veteran suffers from severe insomnia with trouble getting to sleep and frequent awakenings, increasing anxiety and irritability, severe depression with mood swings and suicidal ideation, avoidance of people, and flashbacks. Examination showed him to be casually dressed. His thoughts were reported to be quite disorganized and he was having considerable thinking difficulty. It was stated that he got easily confused and his affect was extremely anxious and a little bit agitated. It was noted that he was depressed. The examiner reported that the Veteran described severe mood swings and suicidal ideation. He stated that there was definite impairment of the Veteran's concentration and attention span. Intelligence was average and communication was noted to be very difficult due to his severe thinking difficulty. PTSD, severe with psychotic features, was diagnosed. It was opined that the Veteran is 100% disabled and unemployable. 

The Veteran was examined by VA in May 2006. The claims file was reviewed. He reported having nightmares and flashbacks. He was noted to be isolated and detached from people. He reported having insomnia and being irritable and angry. On examination, it was noted that orientation was within normal limits. Appearance and hygiene were appropriate, as was behavior. His affect and mood were noted to be abnormal with findings of mood swings which occur daily, verbally abusive and aggressive. Communication was normal and speech was normal. Concentration was normal and panic attacks were absent. There were no delusions no hallucinations and no obsessional rituals. His thought processes are appropriate and judgment was not impaired. Abstract thinking was normal. Memory was mildly impaired. There were no suicidal or homicidal ideations. PTSD was diagnosed. The GAF was 70. 

VA outpatient treatment in July 2007 showed that the Veteran had noted an increase in anger episodes. 

In September 2007 the Veteran was examined by VA. The claims file was reviewed. The Veteran reported that he was starting to have panic attacks. He noted that he was currently a student. The examiner reported that the Veteran is married and that his wife had threatened divorce it the Veteran did not get help. Socially it was stated that the Veteran liked to spend time with his boys and ride four-wheelers. He reported having trouble getting along with people. He noted that he did not sleep well, had temper problems, nightmares, and flashbacks. He stated that he had passive suicidal thought. Examination showed him to be goal directed with no looseness of association. He had a normal rate and flow of speech. He was oriented to time, place, person and situation. There was no evidence of psychosis with no evidence of delusions or hallucinations. He had good eye contact. He reported having panic attacks which began six months prior. He stated they occur about once a week. The diagnosis was, PTSD. The GAF was 58. 

Outpatient records show that in October 2007, the Veteran was noted to still having panics. The GAF was 57 with a notation of 56 for the past year. In November 2007, he reported that the medications were helping. In February 2008 it was noted that he was responding to quetiapine. In September 2008, it was noted that he was stressed but stable. In March 2009, he was stable with symptoms, but at a lower level. GAF was 58 with a notation of 57 for the past year. 

The Veteran was examined by VA in January 2011. The claims file was reviewed. His medical history was documented. It was noted he was married but he and his wife still fight. He noted that he did not do much of anything and that his headaches and knee keep him from his usual activities. He reported having below average grades in school. On examination, he was noted to be casually dressed with unremarkable speech and a cooperative and attentive attitude. His affect was blunted and his mood depressed. His attention was intact and he was oriented to person, time, and place. He had no delusions. He had sleep impairment and no hallucinations. It was noted that he had anger dyscontrol and verbal aggression. The Veteran reported daily panic attacks. He had homicidal and suicidal thoughts. His impulse control was fair with no episodes of violence. He could maintain his personal hygiene. His recent and remote memories were moderately impaired with normal immediate memory. It was noted that he had obsessive ritualistic behavior exhibited by checking locks and cleaning. The examiner stated that there was not total social and occupational impairment due to PTSD. He had deficiencies in thinking, in school, and in family relations as well as in mood. Chronic PTSD was diagnosed and a GAF of 51 was assigned. 

The Veteran was granted service connection for PTSD in a July 2006 rating decision; he was assigned a 30 percent rating, effective February 27, 2006 and by rating decision in March 2001, he was assigned a 50 percent rating effective from January 18, 2011. In addition to PTSD, the medical evidence of record reflects a diagnosis of depression. Where it is not possible to distinguish the effects of a nonservice-connected condition from those of a service-connected condition, the reasonable doubt doctrine dictates that all symptoms be attributed to the Veteran's service-connected disability. See Mittleider v. West, 11 Vet. App. 181 (1998). As there is no indication here that it is possible to distinguish the symptoms of the Veteran's various psychiatric disorders (no medical professional has done so), for the purposes of this appeal only the Board considers all of his psychiatric symptoms to be attributable to his service-connected PTSD. After review of the evidence, the Board finds that the Veteran's service-connected PTSD does not more nearly approximate a rating higher than 30 percent prior to January 18, 2011 and that thereafter the disorder more nearly approximates the criteria for a 70 percent rating. 

Prior to January 18, 2011

During this time frame the Board finds that a rating beyond 30 percent is not warranted. The Board finds that, for the initial rating period prior to January 18, 2001, the Veteran's service-connected PTSD has been characterized by depression, anxiety, panic attacks, chronic sleep impairment, and mild memory loss. 

In order to achieve the next-higher 50 percent rating, the evidence must demonstrate occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g. retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing effective work and social relationships. 38 C.F.R. § 4.130, DC 9411.

The evidence in this case does not reveal communication difficulties. His speech has been documented as coherent, goal directed, and normal. Communication is noted as normal. With regard to panic attacks, the September 2007 notes a complaint of panic attacks but the Veteran did not indicate that they occurred more than once a week. Regarding comprehension skills, there was no evidence of any difficulty in understanding complex commands. The Veteran's insight and judgment were intact. There were was no significant impairment in the Veteran's thought processes and the Veteran was oriented in all spheres. Further there was no evidence of delusions or hallucinations. With respect to the Veteran's memory, the May 20106VA examination report indicated mild impairment. 

As reported above, the Veteran's PTSD symptoms are mild. The Board concludes that the Veteran's disability picture does not more nearly approximate the next-higher 50 percent rating criteria under DC 9411 for the initial rating period prior to January 2011. The Veteran's PTSD symptoms, as a whole, are contemplated by the 30 percent rating. See 38 C.F.R. § 4.7 (the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating, otherwise, the lower rating will be assigned.). 

The Board acknowledges that a private examiner in February 2006 noted that severe symptoms were present. That is, he noted suicidal ideation with difficulty in thinking and concentration. However the findings on the whole do not support a 50 percent rating. Further this particular assessment is not sustained or supported by the symptomatology discussed by the VA examiner, just 3 months later in May 2006 or after that time during the period in question. And overall, when looking at the totality of the evidence, the Veteran's level of occupational and social impairment is more than adequately reflected in the 30 percent rating currently assigned. 38 C.F.R. § 4.10. In short, the majority of his symptoms throughout the appeal period in question do not support a higher rating to 50 percent or beyond. 

For these reasons, the Board finds that a preponderance of the evidence is against the Veteran's claim for a rating in excess of 30 percent for PTSD, for the initial rating period from November 27, 2009. Because the preponderance of the evidence is against the claim, the benefit of the doubt doctrine is not for application. See 38 U.S.C.A. § 5107; 38 C.F.R. § 4.3, 4.7. 

From January 18, 2011

The Board has reviewed the January 2011 VA examination report which is the basis for the RO's assignment of a 50 percent evaluation. The Board finds that this evidence supports the assignment of a 70 percent rating. The evidence documents such signs and symptoms as, suicide and homicide ideation, depression, some difficulty with daily activities, difficulty socializing with friends or family (socially avoidant behavior), short-term and long term memory difficulties, deteriorating functional abilities including occupational and social impairment, mood swings, and sleep impairment. He had obsessive ritualistic behavior exhibited by checking locks and cleaning, daily panic attacks, deficiencies in thinking, in school, and in family relations as well as in mood. A significant number of his symptoms are indicative of a rating beyond 50 percent. In addition, while the GAF score was 51, indicative of moderate impairment, the evidence is more supportive of a higher 70 percent rating for severe impairment. It is noted that the VA physicians' use of the GAF term is not altogether dispositive of the rating that should be assigned. 38 C.F.R. §§ 4.2, 4.6. 

In summary, resolving doubt in his favor, all of these symptoms provide a basis for assigning a higher 70 percent rating for PTSD from January 2011, since several of the criteria for this higher 70 percent rating are shown. See Mauerhan v. Principi, 16 Vet. App. 436 (2002) (rating criteria provide mere guidance as to the severity of symptoms contemplated for each rating; they are not all-encompassing or an exhaustive list). 

However, the evidence of record does not warrant an even higher initial 100 percent rating. 38 C.F.R. § 4.7. In this regard, all the medical and lay evidence of record is not indicative of someone who has total occupational and social impairment with deficiencies in most areas, required for the higher 100 percent rating. 38 C.F.R. § 4.130. The VA examiner noted no gross impairment in thought processes or communication; no grossly inappropriate behavior; no persistent delusions or hallucinations; no persistent danger of hurting others; no inability to keep daily hygiene; and no memory loss for names of close relatives, own occupation, or own name (he only exhibited some short and long term memory loss, but none of these particular factors); and no disorientation to time and place. See 38 C.F.R. § 4.130. 

The Veteran is still able to maintain relationships with his family members, including his wife and sons. He is able to take care of basic activities of daily living. The Veteran was still able to manage his monthly financial affairs according to the VA examiner. The Veteran is also still able to participate in school, which is not indicative of someone who has total impairment. 

The GAF score was 51 which is indicative of moderate impairment, but not full and complete impairment. Accordingly, the Board finds that the evidence supports an initial disability rating of 70 percent, but no higher, for the Veteran's PTSD from January 2011. 38 C.F.R. § 4.3. 

Other Considerations

The Board has considered whether an extraschedular evaluation would have been warranted for PTSD or for the left knee disorder. In exceptional cases an extraschedular rating may be provided. 38 C.F.R. § 3.321 (2010). The threshold factor for extraschedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Therefore, initially, there must be a comparison between the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the rating schedule for that disability. Thun v. Peake, 22 Vet. App. 111 (2008). 

Under the approach prescribed by VA, if the criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the rating schedule, the assigned schedular evaluation is, therefore, adequate, and no referral is required. In the second step of the inquiry, however, if the schedular evaluation does not contemplate the claimant's level of disability and symptomatology and is found inadequate, the RO or Board must determine whether the claimant's exceptional disability picture exhibits other related factors such as those provided by the regulation as "governing norms." 38 C.F.R. 3.321(b)(1) (related factors include "marked interference with employment" and "frequent periods of hospitalization"). When the rating schedule is inadequate to evaluate a claimant's disability picture and that picture has related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service for completion of the third step-a determination of whether, to accord justice, the claimant's disability picture requires the assignment of an extraschedular rating. Id.

Turning to the first step of the extraschedular analysis, the Board finds that the symptomatology and impairment caused by the Veteran's PTSD as well as his left knee disorder is specifically contemplated by the schedular rating criteria, and no referral for extraschedular consideration is required. The schedular rating criteria, DC 9411, specifically provides for disability ratings based on a combination of history and clinical findings. In this case, considering the lay and medical evidence, the Veteran's PTSD symptoms are part of the schedular rating criteria. As to the left knee disorder DC 5261 and 5260 provide for ratings based on specific criteria. In other words, since the Veteran's disability picture is contemplated by the Rating Schedule, there is no exceptional disability picture that would warrant consideration of factors such as marked interference with employment or frequent periods of hospitalization. Thun, 22 Vet. App. at 116. See also 
38 C.F.R. § 3.321(b)(1). The medical and lay evidence of record fails to show anything unique or unusual about the Veteran's PTSD disability or his left knee disability that would render the schedular criteria inadequate. All of the Veteran's symptoms are contemplated in ratings assigned. 

The schedule is intended to compensate for average impairments in earning capacity resulting from service-connected disability in civil occupations. 38 U.S.C.A. § 1155. "Generally, the degrees of disability specified [in the rating schedule] are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability." 38 C.F.R. § 4.1. In this case, the problems reported by the Veteran are specifically contemplated by the criteria discussed above, including the 
effect on his daily life. In the absence of exceptional factors associated with PTSD, or the left knee disorder, the Board finds that the criteria for submission for assignment of an extraschedular rating pursuant to 38 C.F.R. § 3.321(b)(1) are not met. See Bagwell v. Brown, 9 Vet. App. 337 (1996); Shipwash v. Brown, 8 Vet. App. 218, 227 (1995).


ORDER

An increased rating for left knee arthroscopic and partial medial meniscectomy residuals, beyond 10 percent is denied. 

A separate 10 percent rating for left knee limitation of extension from May 2006 to February 2011 is granted subject to the laws and regulations governing the payment of monetary benefits. 

An increased initial evaluation for PTSD beyond 30 percent prior to January 2011 is denied. 

An increased initial evaluation for PTSD to 70 percent from January 18, 2001 is granted subject to the rules and regulations governing the payment of VA monetary benefits. 

REMAND

Once a Veteran submits evidence of a medical disability, makes a claim for the highest rating possible, and submits evidence of unemployability, an informal claim for a total disability rating for compensation purposes based on individual unemployability (TDIU) is raised. Roberson v. Principi, 251 F.3d 1378, 1384 (Fed. Cir. 2001); 38 C.F.R. 3.155 (2010).

The Court has recently held that a request for a total disability rating due to individual employability resulting from service-connected disability (TDIU), whether expressly raised by a Veteran or reasonably raised by the record, is not a separate claim for benefits, but is rather part of the adjudication of a claim for increased compensation. Rice v. Shinseki, 22 Vet. App. 447 (2009). Thus, when entitlement to TDIU is raised during the appeal of a rating for a disability, it is part of the claim for benefits for the underlying disability. Id at 454.

The record contains medical evidence that the Veteran's service- connected PTSD has rendered him unemployable. He has also indicated that his headaches and knee problem affect his employment, and these are also service-connected disabilities. In a February 2006 statement a private examiner opined that the Veteran was 100% disabled and unemployable due to his PTSD. While the Court has determined that a claim for TDIU is part of the Veteran's claim for an increased rating currently on appeal, the RO has not explicitly adjudicated the entitlement to TDIU. The Veteran would therefore be prejudiced if the Board were to decide this claim without prior adjudication by the RO. See Bernard v. Brown, 4 Vet. App. 384, 394 (1993) (where the Board addresses a question that has not been addressed by the agency of original jurisdiction, the Board must consider whether the Veteran has been prejudiced thereby).

The Court has held that a TDIU claim may not be denied without producing evidence, as distinguished from mere conjecture, that the Veteran's disability does not prevent him from performing work that would produce sufficient income to be other than marginal. Friscia v. Brown, 7 Vet. App. 294 (1995), citing Beaty v. Brown, 6 Vet. App. 532, 537 (1994). In Friscia, the Court specifically stated that VA has a duty to supplement the record by obtaining an examination which includes an opinion on what effect the appellant's service- connected disability has on the ability to work. Friscia, at 297, citing 38 U.S.C.A. § 5107(a) (West 2002); 38 C.F.R. §§ 3.103(a), 3.326, 3.327, 4.16(a) (2010); Beaty v. Brown, 6 Vet. App. 532, 537 (1994) and Obert v. Brown, 5 Vet. App. 30, 33 (1993). In light of the above, the Board finds that the Veteran requires a current VA examination to ascertain whether unemployability due to service-connected disability is demonstrated.


The appellant is hereby notified that it is his responsibility to report for any examination scheduled, and to cooperate in the development of the case, and that the consequences of failure to report for a VA examination without good cause may include denial of the claim. See 38 C.F.R. §§ 3.158 and 3.655 (2010). 

Accordingly, the case is REMANDED for the following action:

1. Supply VCAA notice to the Veteran regarding TDIU claims. 

2. The Veteran should be scheduled for appropriate VA examinations to determine the effect of his service- connected disabilities on employability. The claims folder should be made available to the examiners. The examiners should offer an opinion as to whether the Veteran is unable to secure or maintain substantially gainful employment solely as a result of his service connected disabilities. The examination reports must include a complete rationale for all opinions and conclusions reached.

3. The RO should review the claims folder and ensure that all of the foregoing development actions have been conducted and completed in full. If any development is incomplete, appropriate corrective action is to be implemented. Specific attention is directed to the report of examination. If the requested report does not include fully detailed descriptions of pathology and all test reports, specific studies or adequate responses to the specific opinions requested, the report must be returned for corrective action. 38 C.F.R. § 4.2 (2009); See also Stegall v. West, 11 Vet. App. 268 (1998).


4. After taking any further development deemed appropriate, the RO should adjudicate the issue on appeal. If a TDIU is not granted, the AOJ should issue a supplemental statement of the case, before returning the case to the Board, if otherwise in order. 


The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West Supp. 2010). 




____________________________________________
F. JUDGE FLOWERS
Veterans Law Judge, Board of Veteran s' Appeals



Department of Veterans Affairs